UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| KAREY GALLERSON,<br><br>                         Plaintiff,<br><br>    v.<br><br>BURLINGTON NORTHERN SANTA<br>FE RAILWAY COMPANY,<br><br>                    Defendant. | CASE NO. C15-5821 BHS<br><br>ORDER GRANTING IN PART<br>AND DENYING IN PART<br>DEFENDANT'S MOTION FOR<br>SUMMARY JUDGMENT |

This matter comes before the Court on Defendant Burlington Northern Santa Fe Railway Company's ("BNSF") motion for summary judgment. Dkt. 44. The Court has considered the pleadings filed in support of and in opposition to the motion and the remainder of the file and hereby grants the motion in part and denies the motion in part for the reasons stated herein.

## I. PROCEDURAL HISTORY

On October 22, 2015, Plaintiff Karey Gallerson ("Gallerson") sued BNSF in Pierce County Superior Court for the State of Washington. Dkt. 1-2. Gallerson asserted

claims for hostile work environment, disparate treatment, unlawful retaliation, and wrongful discharge under the Washington Law Against Discrimination ("WLAD"), RCW 49.60, *et seq*., and negligent infliction of emotional distress ("NIED"). *Id.* ¶¶ 6.1– 6.5. BNSF removed the case to this Court under 28 U.S.C. § 1332. Dkt. 1, ¶ 3.

On November 19, 2015, BNSF moved to dismiss or stay. Dkt. 13. On February 29, 2016, the Court granted the motion, dismissed Gallerson's wrongful termination claim, and stayed the matter pending arbitration of that claim. Dkt. 23.

On October 19, 2017, Gallerson filed a motion to lift the stay. Dkt. 24. Gallerson informed the Court that the arbitrator ordered Gallerson be reinstated and awarded him backpay. Dkt. 24. On December 4, 2017, the Court granted Gallerson's motion to lift the stay. Dkt. 26.

On February 27, 2019, Gallerson filed a motion to amend his complaint to add allegations based on events that occurred after he was reinstated in 2017. Dkt. 40.

On March 20, 2019, BNSF filed a motion for summary judgment on the claims in Gallerson's original complaint. Dkt. 44. On March 21, 2019, the Court granted Gallerson's motion to amend. Dkt. 49. On March 25, 2019, Gallerson filed an amended complaint. Dkt. 51. On April 8, 2019, Gallerson responded to BNSF's motion for summary judgment. Dkt. 53.[1] On April 12, 2019, BNSF replied. Dkt. 57.

---

[1] Gallerson conceded his NIED claim. Dkt. 53 at 2 n.1.

## II. FACTUAL BACKGROUND

Gallerson is an African-American man over the age of 40 who began working for BNSF in 2001. Dkt. 1-2, ¶¶ 4.1, 5.1.[2] During the period at issue, Gallerson worked as a laborer maintaining railroad track. Dkt. 56-1 at 40. Gallerson's claims against BNSF are based on both racial discrimination and age discrimination. The factual history and chronology of this case are extensive and complex, and BNSF seeks summary judgment only on the events occurring through April 2015. Dkt. 57 at 1. Therefore, the Court will set forth a detailed factual chronology.

### A. Commencement of Events at Issue—Fall 2013

In 2013, Gallerson was working for BNSF in Edmonds and Seattle as a laborer. Dkt. 56-2, at 6; Dkt. 56-1 at 15.[3] Laborers work in "sections," teams of between three and seven people doing track maintenance work. Dkt. 56-3 at 19–20.[4] Typically a section includes a foreman, an assistant foreman, a laborer, and a truck driver who all work together on the same tasks. *Id.* at 20, 29–30. Members of a section are union employees and are supervised by non-union management who perform only supervisory tasks. *Id.* at 18, 28. The roadmaster is the management employee directly supervising the section and the division engineer supervises the roadmaster. *Id.* at 23. Gallerson had sued BNSF for

---

[2] Gallerson testified at his deposition on October 10, 2018, that he was fifty-five years old. Dkt. 56-1 at 32. Dkt. 56-1 is the Deposition of Karey Gallerson. For all depositions referenced, the Court refers to the page numbers on the deposition transcript instead of the ECF page numbers.

[3] Dkt. 56-2 is the Deposition of Antonio Espinosa.

[4] Dkt. 56-3 is the Deposition of Daniel Baker.

racial discrimination in 2012, and the case was ongoing in 2013. Dkt. 56-1 at 15.

Gallerson's roadmaster at this time was Jessica Batista, and Gallerson had no objection to

Batista's treatment of him. *Id.* at 38–40.

On December 24, 2013, Gallerson was involved in a domestic altercation. Dkt. 1-2, ⁋ 5.5. He was charged with several felonies but continued to work while the charges were pending. *Id.* ⁋ 5.5. In early February 2014, Gallerson's racial discrimination lawsuit settled. Dkt. 56-1 at 15; Dkt. 1-2, ⁋ 5.2. [5] On February 18, 2014, Gallerson broke his thumb while working and commenced medical leave. Dkt. 1-2, ⁋ 5.4; Dkt. 56-1 at 16. On March 29, 2014, Gallerson was involved in another domestic altercation and was charged with "criminal violations." Dkt. 1-2, ⁋ 5.5.

A local news outlet ran an article describing one of the domestic altercations, explaining that "a man allegedly tried to attack his ex girlfriend's new boyfriend in the parking lot with a hammer" and identified Gallerson as the individual wielding the hammer. Dkt. 56, ⁋ 16; Dkt. 56-6 at 22–23. Antonio Espinosa ("Espinosa"), a coworker of Gallerson's who also worked as a laborer, phew testified that after Gallerson injured his thumb, someone printed the article and hung it up "in the section house in Seattle for everybody to see." Dkt. 56-2 at 44. It is unclear specifically when this occurred. Dkt. 56-2 at 44, 79–80; Dkt. 56, ⁋ 16; Dkt. 56-6 at 22–23. The article was displayed on a corkboard that had only otherwise been used for obituaries or company news. Dkt. 56-2

---

[5] Gallerson had previously filed another suit against BNSF alleging racial discrimination at some point between 2005 and 2012. The outcome of this suit is not clear from the record. *See* Dkt. 1-2, ⁋ 5.2

at 79–80. The article was up briefly—"[m]aybe that day." *Id.* at 88. Espinosa testified that coworkers referred to Gallerson as "MC Hammer" for a short period of time while Gallerson was on leave because of the hammer and because "MC Hammer is black." *Id.* at 45, 79–80, 87.

**B.    Return from Medical Leave—August 2014**

In August 2014, Gallerson returned to work from medical leave. Dkt. 46 at 41; Dkt. 1-2, ₽ 5.4. Daniel Baker ("Baker"), a BNSF management employee who supervised Gallerson during part of the time period at issue, was the roadmaster and Gary Maack ("Maack") was the foreman. Dkt. 56-2 at 38. Espinosa testified that Baker had a reputation for not knowing what he was doing and for trying to take shortcuts but that Maack "always seemed to treat [Gallerson] with respect." *Id.* at 38–40. Baker had joined BNSF in January of 2012 as a management trainee after earning his undergraduate degree and became Seattle Terminal Roadmaster in June 2014. Dkt. 56-3 at 11, 14–17.

Gallerson testified that though he had "never even met [Baker] before" he felt that Baker was "on me constantly" as soon as he returned to work. Dkt. 56-1 at 18, 138. Gallerson testified that Baker harassed him, asking every day about Gallerson's criminal charges in a degrading, raised tone of voice that he did not use with Caucasian employees, even though Gallerson told Baker that he would keep him updated. *Id.* at 24, 135. Baker denied that he had harassed Gallerson or spoke to him disrespectfully, testifying that "I thought I was very understanding . . . when Mr. Gallerson brought up that he had to go to court, you know, and on pretty short notice, you know, making sure he took the day off and that everything was fine," though admitted that he "might have"

asked Gallerson for periodic updates about the status of his felony charges Dkt. 56-3 at 42, 56–57, 58.

At some point in November or December of 2014, Gallerson testified that either Baker told him "well, I was told to make sure I get you this time," or Baker told Gallerson that the division engineer Chad Scherwinski ("Scherwinski") had told Baker to "make sure he gets rid of [Gallerson] this time." Dkt. 56-1 at 24, 102. In deposition, Baker denied ever telling Gallerson that he was going to "get him" or was told to "get him." Dkt. 56-3 at 57–59. Gallerson was unsure whether Baker knew about his prior discrimination lawsuits against BNSF. Dkt. 56-1 at 45.

Gallerson testified that when he did not "tell [Baker] what he wanted to hear," regarding updates on his criminal charges, Baker started assigning him to tasks outside his job description which were not appropriate for someone who had worked at BNSF as long as Gallerson had. *Id.* at 26. Though a foreman, Maack in this instance, would typically allocate daily assignments and Gallerson believed Maack was fair, Gallerson testified that Baker would sometimes specifically assign Gallerson to undesirable tasks. *Id.* at 42–44, 79. Baker testified that there was no requirement that tasks be assigned by seniority, and he was not aware of a practice of assigning tasks based on seniority. Dkt. 56-3 at 31–32.

The undesirable tasks included being separated from the work crew to do cleanup "just doing stuff that nobody did or had to do," or flagging. Dkt. 56-1 at 35. Flagger was an alternative to laborer, and workers could bid on the job they wanted to perform. *Id.* at 50. Based on his fifteen years of experience at BNSF, Gallerson believed individual

cleanup and flagging to be outside the job duties of a laborer. *Id.* at 134. Gallerson

testified that typical laborer tasks included loading equipment for and performing jobs

such as taking rail ties out or replacing rail defects, and if laborers had to do cleaning

work, it was only assigned to the group and never to individuals. *Id.* at 40, 52, 77.

Gallerson testified that during the entire time he had worked at BNSF, he had never seen

anyone ordered to do these cleanup tasks: cleaning an area which was "completely dirty

and stuff everywhere anyway" and stacking items without instruction but being told later

by Baker that the items were stacked incorrectly. *Id.* at 35, 51. While sometimes other

laborers were asked to do flagging work, Gallerson explained that he was the only one

who was mandated to do it. *Id.* at 75.

Baker testified that it was not unusual that a laborer might need to do some

flagging during the day while other laborers did a minor task and explained that he

understood it to be a preferred task because it was less physically demanding than other

work, though he knew some workers "wanted to work as hard as they could to get the job

done quickly" and found flagging "boring." Dkt. 56-3 at 34–37. Baker testified that

Gallerson never told Baker that he did not enjoy flagging, that he could only recall one

instance of Gallerson doing flagging work, and that Baker did not recall whether he or

Maack had assigned Gallerson to that task. *Id*. at 37, 46–47. Baker testified that the only

reason a worker would be assigned to do cleanup work on an individual basis was if that

person was not feeling well or was experiencing personal stress such that it was not safe

to have them working on live railroad track. *Id*. at 51–54. Baker testified that he never

assigned anyone such work who did not request it. *Id*. at 54.

Baker ordered Gallerson to perform undesirable tasks four or five times between August 2014 and March 2015. Dkt. 56-1 at 78–79. Gallerson believed Baker was acting on behalf of Scherwinski, Baker's supervisor. *Id.* at 57; Dkt. 56-3 at 23. Regarding his environment at work, Gallerson explained "I work - - walk in a room, 25 guys, I'm the only black guy there" and his coworkers "gave [him] s*** everyday. Everyday." Dkt. 56-1 at 31.

At some point, Gallerson called BNSF's human resources hotline to report Baker's behavior, telling the person he spoke with that he believed he was experiencing retaliation based on his previous lawsuit. *Id.* at 22–30. Gallerson expected that someone would talk to Baker and ask him to leave Gallerson alone because BNSF had a policy espousing zero tolerance of harassment. *Id.* at 30.

Also within this time period, a coworker told Gallerson that a management-level BNSF employee told the coworker Gallerson had "played the race card." *Id.* at 59–61. Gallerson testified that after this, his other coworkers did not want to work with him "because if they do something wrong they're afraid that that the company is watching me or sending people out to watch me, that they'll see them do something wrong as well. And everybody is afraid to lose their job, and I don't blame them." *Id.* at 62. Gallerson testified that trust among the crew is a critical part of work as a laborer because of the safety risks involved in working on live railroad tracks—"[w]e lose our lives out there and we depend on each other as a group"—and so it worried him to be snubbed by his coworkers as the result of being singled out by management. *Id.* at 67–70.

When asked in his deposition whether he told anyone that Gallerson had "played the race card," Baker testified "[n]ot that I can remember, no." Dkt. 56-3 at 43. He recalled having conversations with BNSF union employees about Gallerson's previous "situations" but did not "specifically remember a time" when someone told him Gallerson "played the race card." *Id.* Baker testified that "at that time, I don't think I knew. I didn't know" about Gallerson's lawsuits, and explained that by "situation," he meant Gallerson's injury or the domestic dispute. *Id.* at 44. Baker testified that he did not tell any union employees that Gallerson had sued BNSF in the past. *Id.* at 45.

On January 22, 2015, Gallerson pled guilty to two felony charges. Dkt. 1-2, ⁋ 5.6. He provided notice to BNSF according to BNSF policy. *Id.*, ⁋⁋ 5.6, 5.7.

On March 5, 2015, Gallerson informed his supervisor that he would be sentenced the following day. *Id.*, ⁋ 5.8. On March 6, 2015, Gallerson was sentenced to ten months of home monitoring which included permission to attend work. *Id.* On March 9, 2015 Baker gave Gallerson a notice that "an investigation had been scheduled against [Gallerson] dated March 16, 2015," based upon his alleged failure to report his criminal convictions. Dkt. 1-2, ⁋ 5.9; Dkt. 56-3 at 107, 113–14. Gallerson testified that he had complied with the collective bargaining agreement in reporting his felony convictions. Dkt. 56-1 at 107–08. Gallerson also testified that Scherwinski was aware of his previous lawsuit and likely recommended that he be investigated. *Id.* at 45–46. Baker testified that Scherwinski told Baker to "give the investigation" to Gallerson, but also testified that no one in management ever complained to him about Gallerson's previous lawsuit. Dkt. 56-3 at 70, 78. Baker brought a BNSF police officer with him to deliver the notice of

investigation, which he testified was fairly typical. *Id.* at 62–65. Baker told Gallerson that anyone who is convicted of or pleads guilty to a felony gets fired from BNSF, Dkt. 56-1 at 108, though Baker testified that he did not actually know whether BNSF discharges every employee with a felony conviction and that Gallerson was the only person with a felony conviction he encountered while working there, Dkt. 56-3 at 61. Gallerson testified that his union representative Tim Gillum told him about another BNSF worker who had a felony charge and was not fired but in fact allowed to keep working without interruption on a probationary status. Dkt. 56-1 at 106–08. Gallerson testified that there were other employees who went "outside the limits" multiple times and did not get investigated or got investigated but received a waiver. Dkt. 56-1 at 98–101.

On March 16, 2015, the investigation was postponed from March 16, 2015 to March 18, 2015. Dkt. 1-2, ⁋ 5.10. Gallerson testified that the collective bargaining agreement required investigations to take place within two weeks of an incident, but because he was not investigated until "a month and a half after the fact," he believed the investigation was being conducted for illegitimate, retaliatory purposes. Dkt. 56-1 at 103. Baker testified that Gallerson told Baker he had pled guilty "but that he could change that plea anytime up until sentencing." Dkt. 56-3 at 79. Gallerson also testified he believed BNSF treated older workers differently from younger workers—"it seems they just find a way to terminate you." Dkt. 56-1 at 111.

In mid-April 2015, Gallerson was terminated from BNSF. Dkt. 1-2, ⁋ 5.1. The stated reason for the termination was "'violation of MWOR 1.6.2 Notification of Felony

Conviction' and MWOR 1.6 Conduct." *Id.* ℙ 5.13.[6] Gallerson appealed the termination.

*Id.* ℙ 5.17. BNSF did not respond or answer the appeal within 60 days, which as

Gallerson alleges, triggered a policy "which necessitated reversal of the termination and

reinstatement of [Gallerson] with back wages." *Id.*; Dkt. 56-6 at 103–04. Gallerson also

alleged that "[d]uring this same time, another Caucasian male named Andrew Dube filed

an appeal of his termination with BNSF and BNSF also failed to respond/answer Mr.

Dube's appeal as well. Mr. Dube's termination/discipline, however, was overturned and

dismissed based on BNSF's untimeliness to respond/answer the appeal." Dkt. 1-2, ℙ 5.17.

 Gallerson filed this lawsuit on October 28, 2015. Dkt. 1-2. Gallerson was out of

work from Spring 2015 through Fall 2017 and was unable to find any job with pay

similar to his BNSF wages. Dkt. 56-1 at 34. On February 29, 2016, the Court granted

BNSF's motion to dismiss Gallerson's termination claim and stayed Gallerson's

remaining claims pending completion of arbitration. Dkt. 23.

## C. Reinstatement—Fall 2017

 In arbitration, Gallerson won reinstatement. Dkt. 51, ℙ 5.19. This news circulated

in the office, and Espinosa testified that coworkers made statements such as "I can't

believe he got his job back" and "[w]hat is the Union doing?" Dkt. 56-2 at 7. Espinosa

testified that though he saw no cause for concern "there w[ere] a lot of people pretty

upset" in part based on Gallerson's race. *Id.* at 7, 46–47. Espinosa testified that

Gallerson's prior lawsuits against BNSF were part of these conversations and it was

---

[6] "MWOR" refers to "Maintenance of Way Operating Rules." *See* Dkt. 47, ℙ 4.

common knowledge that these prior lawsuits were for discrimination, but he did not know specifically what the lawsuits were about and did not hear about them from management. *Id.* at 15, 59–60. Espinosa did not believe his coworkers' animosity towards Gallerson was based simply on interpersonal differences because Gallerson was respectful to his coworkers and "would approach them, like -- you know, like Wait a minute now. Let's talk about this. What's going on?" *Id.* at 49.

Shortly before Gallerson returned to work, the foreman Matt Wells ("Wells") sat the crew down and told them "[w]e all got to be careful of what we do and what we say when Karey gets here." *Id.* at 12. Espinosa was "pretty sure" Wells was referring to racist jokes and later recalled Wells having told Espinosa a joke Espinosa believed was based on Espinosa's Mexican heritage. *Id.* at 13, 21.

In November 2017, Gallerson was reinstated to his position at BNSF. Dkt. 51, ⁋ 5.19. He began working with a section based in Tacoma. Dkt. 56-2 at 10. He alleged that upon reinstatement he "encountered new acts of hostile work environment, disparate treatment, retaliation (based on race, age) and his job was recently cut." Dkt. 51, ⁋ 19.

Gallerson testified that he experienced a lot of stress and was prescribed a sleeping aid. Dkt. 56-1 at 128–29 ("I'm like, dang, what's going to go on today. You know, what kind of position are they going to put me in today."). In Tacoma at this time, the roadmaster was Jarrell Williams ("Williams"), the general foreman was Jeff Hocker, Wells was the foreman, and the assistant foremen were Jason Winans ("Winans") and

Kyle Silvia ("Silvia"). Dkt. 56-2 at 56; Dkt. 55, Declaration of Anthony Gibbs, ¶ 3.[7]

Gallerson had had difficulty with Winans before—Gallerson testified that "when we did the [one of the previous racial discrimination] lawsuit[s] it was against Jason." Dkt. 56-1 at 73. Espinosa testified that Hocker told Espinosa a racist joke based on Espinosa's Mexican heritage but he never observed Williams make any race-related comments or treat anyone disrespectfully. Dkt. 56-2 at 53, 56–57.

Gallerson was required to take the standard rules test for returning workers, but three weeks later he was also required to take a rules refresher test which he understood should normally only be required once a year as a refresher after taking the entry or returning worker test. Dkt. 56-1 at 19. Another worker returned after time away just before Gallerson returned and told Gallerson that he was not required to take the rules test twice. *Id.* at 48. Two months after being reinstated, Gallerson was required to take a third test, and testified "[i]t's like I'm doing things that no one else has to do constantly." *Id.* at 20.

Upon his return, Gallerson's coworkers Cory Abrahamson, Silvia, and Winans commented that he "shouldn't have gotten his job back and especially with backpay." *Id.* Espinosa confirmed that he had heard Silvia make this statement to Gallerson. Dkt. 56-2 at 85. Gallerson testified he had not told anyone about the backpay, leading him to believe that one of the foremen or management emlpoyees had shared this information. Dkt. 56-1 at 21–22. Silvia told Gallerson "we [are] going to call you target. That's your

---

[7] BSNF argues that Kyle Silvia's last name is actually "Sliva." Dkt. 57 at 3.

nickname . . . . They['re] watching you." *Id.* at 82. Gallerson testified that Silvia used the nickname in front of management including Matt Wailes. *Id.* at 136, 137.[8] Silvia told Gallerson this approximately fifteen or twenty times between Gallerson's reinstatement in November 2017 and Gallerson's deposition in October 2018. *Id.* at 85. Winans also frequently told Gallerson "they['re] watching you. Yeah, they [have] their eye on you." *Id.* at 87. Gallerson testified that Silvia frequently heckled him when something happened, telling their other coworkers "[h]e'll put a lawsuit on you, just like -- you know, he had like three or four lawsuits already." *Id.* at 86. Silvia would also regularly call Gallerson old and feeble. *Id.* at 88.

The Tacoma section had a trailer office which housed a common area, a foreman's office, and lockers, which the workers would enter each day. Dkt. 55, ⁋ 3. On November 16, 2017, Anthony Gibbs ("Gibbs"), an African-American man who has worked for BNSF for decades, observed the letters "KKK" written prominently in faded marker near the top of on one of the assistant foreman's lockers. *Id.* ⁋ 4. Gibbs declares the letters were "clearly visible to foremen and every employee who walked into that trailer daily," including Gallerson and inferred that because the letters were "faded and not fresh" they had "been up there for some time." *Id.* ⁋⁋ 5–6. Gallerson testified that Williams, the roadmaster, saw the letters. Dkt. 56-1 at 133. Gallerson testified that he did not see the letters when he first walked in or for the first few days of his return, but when he did, he commented on them but his coworkers acted like the letters were not there. *Id.* at 92–94.

---

[8] It is not apparent from the deposition transcript whether Gallerson's testimony referred to someone named Wails or to Wells, the foreman.

After waiting a week to give management the benefit of the doubt Gibbs asked management to remove the letters. Dkt. 55, ⁋ 5. Gallerson testified that some time later M.C. Brown, another Black worker, saw the writing and heatedly stated that it needed to be removed. Dkt. 56-1 at 92. About two weeks later, Gibbs noticed the letters had been removed. Dkt. 55, ⁋ 5.

Espinosa testified generally that between Gallerson's reinstatement and Espinosa's return to the Seattle office in September 2018 he felt coworkers were treating Gallerson differently because he had been reinstated, did not treat Gallerson or others with seniority with respect, and acted with "a lot of animosity" and "a lot of anger." Dkt. 56-2 at 11–12, 42. Espinosa gave the example of a time when he, Gallerson, and two other workers were seated in a four-seater truck, and "they made him go to the other truck with somebody" which was one of the reasons Espinosa "felt like they were just picking on [Gallerson]," treating him like "the stray cat or something," even though the crew had been shorthanded during the period prior to Gallerson's reinstatement. *Id.* at 17, 50. Coworkers would not respond or respond in an atypical manner to Gallerson's morning greetings and would play a game pretending to plan a barbeque but tell Gallerson he would not be invited. *Id.* at 19, 42. Espinosa heard one person comment that Gallerson had "played the race card" and in all, he heard coworkers discuss Gallerson's reinstatement five or six times between October 2017 and August 2018. *Id.* at 40–41, 43. Espinosa also testified that Wells would leave Gallerson out of the loop or "kind of put [Gallerson] of to the side a little bit" and would negatively highlight Gallerson's vacation days but not others' vacation days by remarking on Gallerson's absence. *Id.* at 11–12, 30–32.

Espinosa left the Tacoma office for Seattle due to his own concerns about the workplace environment in Tacoma. *Id.* at 23–34. Specifically, Wells screamed and cursed at him, Gallerson, and two Caucasian coworkers for reasons Espinosa found unwarranted and Wells again spoke disrespectfully to Espinosa shortly after. *Id.*

On December 4, 2017, the Court reopened the case. Dkt. 26.

Marshall Flores ("Flores") replaced Williams as roadmaster in or around June 2018. *See* Declaration of Karey Gallerson, Dkt. 54, ¶ 3. Gallerson declares that Flores treated him with racial disrespect, talking to him "very harshly and with intimidating behavior," and communicating with Gallerson like Gallerson "was dumb or not on his level of intelligence." *Id.*

Gallerson declared that between October 2018 and March 2019, Silvia has continued to refer to Gallerson as "target" every time Silvia sees Gallerson. Dkt. 54, ¶ 2. Gallerson explained that he perceives the word "target" as connected to his racial identity "because a target is typically black in color and reminds me that it is something to shoot or kill." *Id.* Silvia continued to refer to Gallerson as "'old and feeble,'" has called him old and feeble at least twenty times and has called him "target" between fifteen and twenty times. *Id.* At least some of Gallerson's other coworkers "continue to follow foreman Silvia's lead . . . refer to [Gallerson] as 'target' all the time and have picked up on calling [Gallerson] feeble." Gallerson also declared that from October 2018 through at least March 2019 he was "not allow[ed] to ride in the main truck" with his coworkers and the predominately Caucasian crew and Wells would not eat lunch with him, would ignore his greetings and statements in meetings, stop talking when he approached, and look at him

"with disgust and disappointment." *Id.* ¶ 5. Gallerson declared that when his Caucasian colleagues spoke in meetings, other coworkers and management would "look at them and acknowledge them." *Id.* Wells also repeatedly gave Gallerson "the least desirable jobs on the crew, including digging in railroad ties by hand when we have machines to do the work, emptying garbage cans and cleaning out the cabs and beds of trucks by [him]self." *Id.* ¶ 6.

On March 1, 2019, Flores cut Gallerson's job and "physically battered [Gallerson] at that time by grabbing [Gallerson] by both shoulders, telling [him] that [Flores] was told by [Flores's] management specifically to cut [Gallerson's] job." *Id.* ¶ 3. Flores cut Gallerson's position and the positions of two other ethnic minorities. *Id.* Gallerson declared that Flores has "cussed him out in a racially disrespectful way, stating 'I told your ass not to get on that machine.'" *Id.* Flores also pulled Gallerson out of meetings to chastise him in a location visible to Gallerson's coworkers on several occasions. *Id.* Gallerson declared that he has not seen Flores "talk to or treat Caucasians in this manner." *Id.*

When Gallerson's job was cut, he was no longer part of a work crew. *Id.* ¶ 4. Signs appeared in the windows and inside the Tacoma section house featuring pictures of President Trump and the slogan "Make America Great Again." *Id.* Gallerson viewed those signs on a daily basis and believed that "these signs were placed to inform [Gallerson] that [he] was not a preferred race and that the crew was better without [him] as the only African American crew member." *Id.*

## III.  DISCUSSION

BNSF moves for summary judgment as to Gallerson's claims based on events occurring prior to April 2015, which BNSF characterizes as the "first timeframe." Dkt. 57 at 1. Gallerson agrees that BNSF's motion only addresses this limited time period but argues that it should be denied on this basis—for failure to address the comprehensive timeline of his claims. Dkt. 53 at 1–2. After BNSF filed its motion, Gallerson amended his complaint with the Court's leave to add allegations based on events occurring following his return to work in October 2017. Dkt. 57 at 1. BNSF characterizes this as the "second timeframe," and informs the Court that it anticipates filing an entirely separate motion for summary judgment based on the second timeframe following discovery on those claims. *Id.* at 2 ("those claims and allegations are not the subject of or relevant to BNSF's current motion").

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). The Court agrees with the district court in *Blackford v. Action Products Co., Inc.*, 92 F.R.D. 79 (W.D. Mo. 1981), which found that "[t]he award of summary judgment on a portion of a claim is clearly covered by the words of Rule 56(a)." The Court will thus consider whether summary judgment on only part of the factual basis for each claim is appropriate within its analysis of each of Gallerson's particular claims.

### A.  Summary Judgment Standard

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material

fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"). *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The Court must consider the substantive evidentiary burden that the nonmoving party must meet at trial—e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The Court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255). Conclusory,

nonspecific statements in affidavits are not sufficient, and missing facts will not be presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990).

**B.    Merits**

Gallerson has three remaining causes of action under the WLAD: hostile work environment, disparate treatment, and unlawful retaliation. Dkt. 51, ¶¶ 6.1–6.4. Each cause of action is grounded in alleged discrimination on the basis of race, age, and opposition of practices forbidden by the WLAD. *Id.* The WLAD protects employees from age discrimination who are between forty and seventy years old. *Scrivner v. Clark College*, 181 Wn.2d 439, 444 (2014) (en banc) (citing RCW 49.60.180(1); *Griffith v. Schnitzer Steel Indus., Inc.*, 128 Wn. App. 438, 446–47 (2005)).

**1.    Evidentiary Issues**

As a threshold matter, the Court considers BNSF's argument that Gallerson's statement that a coworker told him someone in management told the coworker that Gallerson had "played the race card" during the first time period is inadmissible hearsay. Dkt. 44 at 8.

Gallerson argues that the statement that he played the race card may be admissible either to show the employer's state of mind or to show the effect on Gallerson, the listener, as part of the evidence that he experienced a hostile work environment. Dkt. 53 at 15. BNSF argues that Gallerson cannot recall who made this statement, when it was made, or who in management allegedly made the statement, so even if the statement were not hearsay, it "lacks the specificity required for admissibility." Dkt. 44 at 8.

Gallerson implies that the Court should not consider evidentiary issues when the evidence is not the subject of a formal motion to strike. Dkt. 53 at 15. However, a "court can only consider admissible evidence in ruling on a motion for summary judgment." *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002). The Court is mindful that the Washington Supreme Court declared its agreement with the California Supreme Court that statements made by non-decision-makers or made outside the decisional process may be relevant, circumstantial evidence of discrimination, *Scrivner*, 181 Wn.2d at 450 n.3 (citing *Reid v. Google, Inc*., 50 Cal. 4th 512, 538–46 (2010)), and Gallerson is correct that courts in Washington "generally consider an employer's discriminatory remarks to be direct evidence of discrimination," *Alonso v. Qwest Commc'ns Co., LLC*, 178 Wn. App. 734, 744 (2013). Nevertheless, evidence considered on summary judgment must be admissible at trial.

Gallerson testified at his deposition that a coworker told Gallerson that a management-level BNSF employee, most likely Baker, told the coworker Gallerson had "played the race card." Dkt. 56-1 at 59–61. When asked in his deposition whether he told anyone that Gallerson had "played the race card," Baker testified "[n]ot that I can remember, no." Dkt. 56-3 at 43.

The first-level statement is the statement from management to the coworker that Gallerson had played the race card. The second-level statement is that coworker's statement to Gallerson that someone in management said Gallerson had played the race card.

Gallerson would not offer the first-level statement for its truth, that he in fact did play the race card, and so it would either not be hearsay at all, *United States v. Payne*, 944 F.3d 1458, 1472 (9th Cir. 1991), *cert. denied*, 503 U.S. 975 (1992), not hearsay as the admission of a party opponent, Fed. R. Evid. 801(2), or could fall under the exception to the hearsay rule for statements showing the declarant's state of mind, Fed. R. Evid. 803(3). However, for evidence that the statement was made, Gallerson would have to rely on second-level statement, the coworker's statement, for the truth of the matter asserted, that management made the statement. Because if Gallerson sought to show BNSF's state of mind he would have to offer his coworker's statement for its truth with no applicable exception, it is inadmissible hearsay. Gallerson does not address the double hearsay problem and sets forth no other evidence establishing that management actually made this statement.

However, Gallerson could offer his coworker's statement to show its effect on Gallerson. If offered for this purpose and not for its truth, the statement would not be hearsay, *Payne*, 944 F.3d at 1472, and could be relevant to his perception of the workplace environment. Therefore, the Court will incorporate into its analysis Gallerson's arguments that pertain to Gallerson's understandings and perceptions but will not incorporate Gallerson's arguments that pertain to evidence of management's intent.

BNSF also argues that Gallerson's testimony that a coworker told him he had a target on his back is inadmissible hearsay and insufficiently specific. Dkt. 44 at 8. The Court finds that this statement could also be offered to show its effect on Gallerson, *Payne*, 944 F.3d at 1472, and so will not categorically exclude it from the analysis.

Further, the Court's resolution of this motion does not depend on the admissibility of any of these statements, nor is the Court making a comprehensive ruling on the admissibility of these statements, which must be considered in the context of the particular point they are offered to prove.

### 2.     Hostile Work Environment

"To establish a prima facie hostile work environment claim, the plaintiff must allege facts proving (1) the harassment was unwelcome, (2) the harassment was because the plaintiff was a member of a protected class, (3) the harassment affected the terms and conditions of employment, and (4) the harassment is imputable to the employer." *Alonso*, 178 Wn. App. at 749 (citing *Loeffelholz v. Univ. of Wash.*, 175 Wn.2d 264, 275 (2012)). BNSF argues that Gallerson cannot prove a hostile work environment prior to April 2015 because he fails to show he was harassed, to satisfy the first prong, and fails to show he was subject to offensive conduct sufficiently severe as to satisfy the third prong. Dkt. 44 at 6–7.

The Washington Supreme Court has explained that "[a] hostile work environment 'occurs over a series of days or perhaps years . . . . Such claims are based on the cumulative effect of individual acts." *Loeffelholz*, 175 Wn.2d at 273 (quoting *Antonius v. King County*, 153 Wn.2d 256, 264 (2002)). "The standard for linking discriminatory acts together in the hostile work environment context is not high." *Id.* at 276.

While BNSF argues that "Gallerson cannot rely on assertions that his work environment was hostile after October 2017 to support his claim his work environment was hostile prior to April 2015," Dkt. 57 at 7 (citing *Robinson v. Pierce Cty.*, 539 F.

Supp. 2d 1316, 1330 (W.D. Wash. 2008)), the Court finds its previous decision in *Robinson* distinguishable. In *Robinson*, the plaintiff "did not form the subjective belief that the working environment was hostile . . . until after he was laid off." 539 F. Supp. 2d at 1330. The Court found the plaintiff's primary evidence of discrimination unpersuasive in part because the evidence consisted of documents created years after the plaintiff's termination. *Id*. Here, Gallerson had the contemporaneous belief that his treatment was on the basis of one or more protected statuses based on at least some circumstantial evidence—for example, the timing of the harassment in relation to the settlement of his racial discrimination lawsuit.

In any event, BNSF has failed to persuade the Court that it may grant summary judgment on a temporally limited set of facts supporting a hostile work environment claim. When analyzing cumulative effects, potentially over a period of years, under a low standard for linking discriminatory acts together, the Court finds it is not appropriate to grant summary judgment as to a temporally limited set of facts supporting this "unique" claim type. *See Loeffelholz*, 175 Wn.2d at 273–76. ("We relied on the unique nature of a hostile work environment when we decided in *Antonius* to allow a plaintiff to recover for all related conduct straddling the statute of limitations.") (citing *Antonius*, 153 Wn.2d at 271). Therefore, the Court denies BNSF's motion on this claim.

### 3. Disparate Treatment

To establish a prima facie disparate treatment claim, Gallerson "must show that his employer simply treats some people less favorably than others because of their protected status." *Alonso*, 178 Wn. App. at 743 (citing *Johnson v. Dep't of Soc. & Health*

*Servs.*, 80 Wn. App. 212, 226 (1996)). He may either satisfy "the *McDonnell Douglas* burden-shifting test that gives rise to an inference of discrimination" or show direct evidence that BNSF "acted with a discriminatory motive in taking an adverse employment action against him based on his protected status," *Alonso*, 178 Wn. App. at 743–44 (citing *Kastanis v. Educ. Employees' Credit Union*, 122 Wn.2d 483, 491 (1993)), and show that he was doing satisfactory work, *Marin v. King Cty.*, 194 Wn. App. 795, 808–09 (2016). *See also Scrivner*, 181 Wn.2d at 546 ("Where a plaintiff lacks direct evidence, Washington courts use the burden-shifting analysis in *McDonnell Douglas* . . . to determine the proper order and nature of proof for summary judgment.") (internal citations omitted).[9] BNSF does not allege that Gallerson's work was unsatisfactory, so the Court proceeds to the adverse employment action and motive elements.

Though traditional adverse employment actions include "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits," *Marin*, 194 Wn. App. at 808–09, courts have found that adverse employment actions may include a hostile work environment, addition of tasks without additional compensation, or failure to provide equal recognition for good work. *See, e.g., Alonso*, 178 Wn. App. at 748 (hostile work environment could be adverse employment action); *Edman v. Kindred Nursing Ctrs. W., LLC*, No. 14-CV-01280 BJR, 2016 WL 6836884 at *7 (W.D. Wash. 2016) (adding task to employee's schedule without subtracting other

---

[9] The *McDonnell Douglas* burden-shifting test comes from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

work or adding compensation could be adverse employment action even when task was within job description); *Davis v. West One Automotive Group*, 140 Wn. App. 449, 459 (2007) (failure to put employee's photo in paper or lend employee his preferred company car when employee won salesman of the month could support claim of disparate treatment).

Gallerson alleges the adverse employment actions he encountered were (1) being subject to a hostile work environment, (2) being ordered to perform undesirable tasks, and (3) being "recently removed or bumped off his crew and forced to work alone." Dkt. 53 at 19.[10] Because the Court has concluded it cannot grant partial summary judgment on the factual basis for a hostile work environment claim, the Court also cannot grant summary judgment on the basis that Gallerson was not subject to disparate treatment through a hostile work environment on a limited factual analysis for any of the potential bases—race, age, or plaintiff in a previous racial discrimination lawsuit. Gallerson also argues that retaliation constitutes an adverse employment action and identifies the same series of experiences being singled out for undesirable tasks the retaliatory conduct. *Id.* at 21, 22. Thus, the Court's analysis of the actions and their impact addresses both framings.

Regarding being ordered to perform undesirable tasks, Gallerson makes specific allegations which fall within the first time period—the four to five instances where

_____

[10] It is difficult for the Court to evaluate this allegation based on the information in the record. Gallerson does not explain what it means for a job to be eliminated or how if his job was eliminated, he would continue to perform work but would perform this work alone and not as part of a crew. Moreover, it pertains to the second time period and so is either not at issue in this motion or not decided in this motion as part of a hostile work environment claim.

Gallerson alleges that Baker ordered him to perform flagging or cleaning tasks. Dkt. 56-1 at 78–79. Gallerson's direct evidence of the employer's intent during this time period, management's alleged statement that he played the race card, is inadmissible for that purpose as previously discussed. Applying the *McDonnell Douglas* burden-shifting test to this claim, Gallerson must first put forward evidence to support a prima facie case of discrimination by showing he was within a statutorily protected class, he was subject to an adverse employment action, and others outside the class were not subject to this adverse action. *See Kastanis*, 122 Wn.2d at 490.

BNSF argues being "given undesirable work assignments four or five times in seven months" cannot be an adverse employment action because Gallerson was paid for this work, other laborers "did the same types of jobs from time to time," and Gallerson's subjective belief that the jobs were undesirable is legally irrelevant. Dkt. 44 at 11. However, Gallerson testified not only that he found the jobs undesirable, but that Baker was not just giving him the jobs other workers did not want to take but that he "wouldn't even tell them to take it," and that the cleanup jobs were of a type that he had never seen anyone ordered to do much less ordered to do by themselves in his fifteen years of experience. Dkt. 56-1 at 35, 42, 51. Gallerson also testified that he was the only African-American in the relevant work setting. *Id.* at 31.

While Baker denies that these tasks were less desirable, he also denies that he ordered Gallerson to perform any of them, setting up a question of fact about how Gallerson was treated in comparison to others. Dkt. 56-3 at 51–54; *see also Edman*, 2016 WL 6836884, at *7 (in the retaliation context, "[w]hether a particular action would

ordinarily be viewed as adverse by a reasonable employee is a question of fact appropriate for a jury."). Moreover, the fact that Baker denied ordering Gallerson to perform any task lends some support to Gallerson's framing that being ordered to perform tasks was not part of the workplace practice and was an additional factor making the tasks undesirable. Treating these instances of Baker's conduct as a series, it appears that at least on a cumulative basis a jury could find that a reasonable employee would view the series as adverse, particularly if the method of assignment, singling Gallerson out to receive orders, communicated to other workers that Gallerson was disfavored in a work context where worker cohesion impacted safety.

BNSF does not clearly contest the other elements of the prima facie case. When construing all facts in favor of Gallerson the Court concludes Gallerson has met his burden to put forward evidence of the prima facie case.

Next, BNSF must show a legitimate reason for the treatment. *McDonnell Douglas*, 411 U.S. at 802–04. BNSF argues that "[i]f, as Gallerson contends, Baker gave him certain job assignments, laborers were needed to do flagging and cleaning," and Baker had the authority to assign such jobs. Dkt. 44 at 12. This satisfies BNSF's burden of production. *Edman*, 2016 WL 6836884, at *8 ("The employer must produce relevant admissible evidence of another motivation, but the burden is of production, not persuasion.") (internal citation omitted).

Finally, Gallerson must put forward evidence of pretext. He "may satisfy the pretext prong of the *McDonnell Douglas* framework by offering sufficient evidence to create a genuine issue of material fact either (1) that the employer's articulated reason for

its action is pretextual or (2) that although the employer's stated reason is legitimate, discrimination nevertheless was a substantial factor motivating the employer." *Scrivener*, 181 Wn.2d at 441–42. Proving discrimination was a substantial factor motivating the employer does not require disproving each of the employer's articulated reasons. *Id.* at 447.

Regarding discrimination on the basis of race, the Court finds that it is possible that on the basis of Gallerson's testimony that that he was the only African-American employee out of some twenty-five in his work environment and his testimony that he was the only person ordered to perform undesirable tasks in a manner that singled him out, a reasonable juror could conclude either that BNSF's explanation for the manner in which he was treated was pretextual or that racial discrimination was a substantial motivation in this treatment. Dkt. 56-1 at 31; *Scrivener*, 181 Wn.2d at 441–42.

Regarding retaliation, Gallerson was only at work for a few weeks between the settlement of his lawsuit and his injury, and alleges the harassment began immediately upon his return to work from medical leave. Dkt. 56-1 at 15–16; Dkt. 1-2, ¶¶ 5.2, 5.4. Gallerson also testified that he reported Baker's harassment to HR sometime in the fall of 2014, telling HR he believed the harassment was in retaliation for his racial discrimination lawsuit which had settled at the end of the previous winter. Dkt. 56-1 at 29. It is possible that a reasonable juror could conclude that his status as the plaintiff in a racial discrimination lawsuit was a substantial factor in the disparate treatment Gallerson describes based on the temporal proximity of the lawsuit's settlement to the treatment, even when interrupted by the five months of medical leave. Gallerson's testimony that his

coworkers were standoffish toward him could be circumstantial evidence that someone in management was communicating a negative perception of his successful lawsuit, or that his coworkers perceived management's negative views about him because he was singled out for undesirable assignments.

Moreover, Gallerson testified that Baker told him "well, I was told to make sure I get you this time." Dkt. 56-1 at 24. BNSF characterizes this statement as an "isolated comment." Dkt. 44 at 9. However, in *Scrivner*, the Washington Supreme Court declared its agreement with the California Supreme Court's rejection of the "stray remarks doctrine." 181 Wn.2d at 450 n.3 (citing *Reid*, 50 Cal. 4th at 538–46). The doctrine provides that "statements that non-decision-makers make or that decision makers make outside of the decisional process are deemed 'stray,' and they are irrelevant and insufficient to avoid summary judgment." *Scrivner*, 181 Wn.2d at 450 n.3 (citing *Reid*, 50 Cal.4th at 517). The Washington Supreme Court explained that it agreed with the California Supreme Court that these remarks may be relevant, circumstantial evidence of discrimination. *Id.* (citing *Reid*, 50 Cal.4th at 539). Without an alternate explanation, Gallerson's characterization of this remark as connected to his past suits for racial discrimination is not implausible. BNSF argues that Baker denies having made the statement and argues that the WLAD is not a civility code, Dkt. 44 at 11–12, but these arguments do not, for example, suggest that Gallerson misconstrued innocent actions.

While Gallerson's case prior to April 2015 may be thin, the Court finds that Gallerson has put forward sufficient circumstantial and inferential evidence such that a reasonable juror may be able to find that his race or his history of objecting to racial

discrimination was a substantial factor in the adverse employment actions he experienced. "Once the record contains reasonable but competing inferences of both discrimination and nondiscrimination, it is for the jury to choose between the competing inferences." *Edman*, 2016 WL 6836884 at *6 (citing *Boyd v. State, Dep't of Soc. & Health Servs.*, 187 Wn. App. 1, 12 (2015)).

Conversely, Gallerson does not specify, and the Court has not identified any evidence, circumstantial or otherwise, from which a juror could infer that Gallerson's age was a substantial factor motivating the disparate treatment in the first time period in the form of singling him out for undesirable tasks. For example, Gallerson does not testify that he was the only older worker in the crew. While Gallerson testified that he perceived his seniority was not being appropriately respected—"usually, you know, when you have more seniority than the other guys, they usually ask within the seniority order"—he does not clearly link seniority to age. Dkt. 56-1 at 23, 76–77. Espinosa also testified that he perceived a decrease in respect for seniority from younger workers but that age-related remarks were friendly and he perceived no age-based discrimination from management. Dkt. 56-2 at 11–12, 72–73. The only specific evidence in the record regarding discrimination against older workers at BNSF is Gallerson's testimony that "it seems they just find a way to terminate you." Dkt. 56-1 at 111. However, this statement refers to his wrongful termination claim that was resolved in arbitration, not to his disparate treatment in the form of being ordered to perform undesirable tasks prior to April 2015. The Court finds that Gallerson has failed to articulate evidence from which a reasonable juror could find that Gallerson was ordered to perform undesirable tasks on the basis of age during

the first time period. The Court thus grants summary judgment for BNSF on the specific question of whether Gallerson suffered disparate treatment on the basis of age when he was assigned undesirable tasks prior to April 2015. The Court denies summary judgment on the remainder of Gallerson's disparate treatment claim.

### 4.      Unlawful Retaliation

To show a prima facie case of unlawful retaliation under the WLAD, Gallerson must show he engaged in protected activity, BNSF took an adverse employment action or actions against him, and "retaliation was a substantial factor behind the adverse employment action." *Edman*, 2016 WL 6836884 at *6 (citing *Sims v. Lakeside Sch.*, No. C06-1412RSM, 2008 WL 2811165, at *3 (W.D. Wash. Jul. 16, 2008)). BNSF argues that Gallerson cannot show it took an adverse employment action against him or that retaliation was a substantial factor motivating the action. Dkt. 44 at 12–13.

Regarding the adverse employment action, "[a]t the summary judgment stage, the Court need only determine whether [the plaintiff] has presented substantial evidence for the jury to find that [the defendant's] action would have dissuaded a reasonable worker from making or supporting a charge of unlawful conduct by [the defendant]." *Edman,* 2016 WL 6836884 at *7 (citing *Boyd*, 187 Wn. App. at 13–15; *Burlington N. & Santa Fe R.R. Co. v. White*, 548 U.S. 53, 57 (2006)). Washington courts refer to federal law to construe the WLAD, and in federal law, "context matters" in determining whether an act of retaliation was significant. *Boyd*, 187 Wn. App. at 13. As the Supreme Court has explained, "[a]n act that would be immaterial in some situations is material in others." *White*, 548 U.S. at 69.

Regarding the assignment of undesirable tasks as a retaliatory action, it is possible that a reasonable juror could conclude that ordering a laborer to perform undesirable tasks alone, in a manner that conveys management's dissatisfaction with the worker such that other workers seek to distance themselves from that worker in a line of work where trust among a crew of workers is a critical part of workplace safety could dissuade a reasonable worker from making a charge that the employer has acted unlawfully. *See* Dkt. 56-1 at 31, 35, 42–44, 53, 62, 67–70, 79.

Regarding evidence that a retaliatory motive was a substantial factor in the undesirable tasks assigned, BNSF argues that "it is undisputed Baker was not even aware of the prior lawsuit during this time," and so Baker cannot have been motivated by retaliatory animus. Dkt. 44 at 14. BNSF also argues there is no evidence Baker was aware of Gallerson's contact with HR. Dkt. 57 at 10. BNSF cites *Clark Cty. School Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001) for the proposition that a gap of three or four months between the protected action and alleged retaliation is too long to infer a retaliatory motive. *Id.* The Court agrees that there is no evidence Baker was aware of Gallerson's contact with HR and the timeline is sufficiently unclear that on its own that the inference cannot reasonably be drawn. However, regarding the lawsuit's settlement, temporal proximity is not the only piece of evidence Gallerson relies on—though his testimony may be self-serving, Gallerson's testimony that Baker told him Baker was instructed to "get him" is some evidence that negative treatment of Gallerson was intentional, and the "this time" part of the statement suggests a reference to Gallerson's past lawsuit or lawsuits. Dkt. 56-1 at 24. Even if Baker did not know of the earlier

lawsuits, a juror could infer from this statement that Baker was referring to having been instructed by someone higher up in management who *was* aware of the lawsuits. The Court concludes that on this point, Gallerson has put forward sufficient evidence to create a question of fact as to whether retaliation was a substantial factor motivating BNSF's treatment of Gallerson.

Regarding hostile work environment as a retaliatory action, in *Trizuto v. Bellevue Police Dep't*, 983 F. Supp. 2d 1277, 1290 (W.D. Wash. 2013), the Court concluded that "Washington's courts would recognize a retaliatory hostile work environment claim." "When alleged harassment is in close temporal proximity to a plaintiff's protected activity, a jury may infer that it is retaliatory." *Id.* at 1291 (citing *Dawson v. Entek Int'l*, 630 F.3d 928, 927 (9th Cir. 2011)). Here, the temporal proximity of the harassment's inception is complicated by Gallerson's medical leave, but it may still be sufficiently close that a reasonable juror could perceive a connection. For the same reasons previously discussed, the Court cannot grant summary judgment on a temporally limited set of facts if a hostile work environment would prove an element of a claim.

In sum, the Court denies summary judgment on the partial factual basis for Gallerson's unlawful retaliation claim as well.


## IV.  ORDER

Therefore, it is hereby **ORDERED** that BNSF's motion for partial summary judgment, Dkt. 44, is **GRANTED** only as to the specific question of whether Gallerson

suffered disparate treatment on the basis of age when he was singled out for undesirable tasks prior to April 2015. BNSF's motion is **DENIED** as to all other claims.

Dated this 9th day of July, 2019.

_____
BENJAMIN H. SETTLE
United States District Judge